DONTA L. H.,                          )
                                      )
                    Plaintiff,        )
                                      )
       v.                             )          1:24CV1085
                                      )
FRANK J. BISIGNANO,                   )
Commissioner of Social                )
Security,                             )
                                      )
                    Defendant.[1]     )

**MEMORANDUM OPINION AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Donta L. H., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 2.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 10 (Plaintiff's Brief); Docket Entry 13 (Commissioner's Brief); Docket

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute as Defendant in this suit. Neither the Court nor the parties need take further action to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Entry 14 (Plaintiff's Reply)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

<h2>I.  PROCEDURAL HISTORY</h2>

Plaintiff applied for DIB and SSI (Tr. 237-79), alleging a disability onset date of May 20, 2020 (see Tr. 237, 243, 263, 273). Upon denial of those applications initially (Tr. 85-103, 136-45) and on reconsideration (Tr. 104-31, 155-62), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 164-65).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 46-84.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 11-45.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 234-36, 402-06), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2025.

2.  [Plaintiff] has not engaged in substantial gainful activity since May 20, 2020, the alleged onset date.

---

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 9 at 1.)

3.   [Plaintiff] has the following severe impairments: degenerative disc disease; obesity; sleep apnea; diabetes mellitus; cardiac dysrhythmias (arrhythmias); other disorders of the respiratory system; depression, bipolar and related disorders; anxiety and obsessive-compulsive disorder; substance addiction disorders (drugs and alcohol); post-traumatic stress disorder (PTSD); schizophrenia spectrum and other psychotic disorders; and personality disorders.

. . .

4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [Plaintiff] has the residual functional capacity to perform less than the full range of light work . . . in that he can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently climb ladders, ropes, and scaffolds; frequently stoop; occasionally work at unprotected heights and around moving mechanical parts; and occasionally work in dust, odors, fumes, and pulmonary irritants. He is able to understand, remember, and carry out instructions by performing simple, routine, repetitive tasks but not at a production rate pace (e.g., assembly line work).  He is able to perform simple work-related decisions.  He is able to frequently interact with supervisors and coworkers and occasionally interact with the public.

. . .

6.   [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

3

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from May 20, 2020, through the date of th[e ALJ's] decision.

(Tr. 16-40 (bold font and internal parenthetical citations omitted) (space added).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting

4

<u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

5

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  Id. at 179.[5]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the

_____

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[6]

### B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ did not explain why Plaintiff's subjective complaints were deemed inconsistent with the evidence of record, and the evaluation of the evidence does not provide a clear path to [the ALJ's] reasoning" (Docket Entry 10 at 3 (bold font and block formatting omitted); see also Docket Entry 14 at 1-3);

2) "[t]he ALJ erred by failing to develop the record as requested by Plaintiff's hearing representative" (Docket Entry 10 at 9 (bold font omitted); and

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

3) "[t]he ALJ's failure to ask the VE to consider as a vocational factor the hypothetical claimant's classification as one closely approaching advanced age is error that invalidates the VE's testimony at [s]tep 5 [of the SEP]" (id. at 13 (bold font and block formatting omitted); see also Docket Entry 14 at 3-4).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 13 at 4-19.)

### 1. Plaintiff's Subjective Symptom Reports

In Plaintiff's first issue on review, he maintains that "[t]he ALJ did not explain why Plaintiff's subjective complaints were deemed inconsistent with the evidence of record, and the evaluation of the evidence does not provide a clear path to [the ALJ's] reasoning." (Docket Entry 10 at 3 (bold font and block formatting omitted); see also Docket Entry 14 at 1-3.) More specifically, Plaintiff contends that, although the ALJ found "[Plaintiff's] statements concerning 'the intensity, persistence, and limiting effects of [his] symptoms [] not entirely consistent with the medical evidence and other evidence of record for the reasons explained in th[e ALJ's] decision'" (Docket Entry 10 at 4 (quoting Tr. 22)), "the ALJ never discussed Plaintiff's testimony or [F]unction [R]eports after th[at] point[, and instead] describe[d] two instances of purported inconsistency, provide[d] a lengthy recitation of the medical evidence, in general, and then f[ound] Plaintiff not disabled" (id.). In that regard, Plaintiff

9

challenges both of the inconsistencies upon which the ALJ relied (see id. at 4-7), and argues that "[t]he [ALJ's] recitation of medical evidence is no substitute for an evaluation of Plaintiff's subjective complaints" (id. at 8 (citing Tyndall v. Kijakazi, No. 5:22CV403, 2023 WL 7149493, at *6 (E.D.N.C. Oct. 31, 2023) (unpublished))). In Plaintiff's view, "[t]he ALJ's conclusion regarding Plaintiff's subjective complaints is barren of rationale, and further administrative proceedings are warranted." (Id. at 9.) For the reasons explained in more detail below, Plaintiff's contentions lack merit.

The Commissioner's regulations adopt a two-part test for evaluating a claimant's statements about symptoms. See 20 C.F.R. §§ 404.1529, 416.929; see also Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3 (Oct. 25, 2017) ("SSR 16-3p"). First, the ALJ must determine whether a claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [the claimant]'s symptoms, such as pain." 20 C.F.R. §§ 404.1529(b), 416.929(b); see also SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source" to establish the existence of a medically determinable impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a); see also SSR 16-3p, 2017 WL 5180304, at *3. "Objective medical evidence" consists of medical "[s]igns" ("anatomical,

10

physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements" and that "must be shown by medically acceptable clinical diagnostic techniques," 20 C.F.R. §§ 404.1502(g), 416.902(l)) and "[l]aboratory findings" ("anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," 20 C.F.R. §§ 404.1502(c), 416.902(g)). See 20 C.F.R. §§ 404.1502(f), 416.902(k); see also SSR 16-3p, 2017 WL 5180304, at *3.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of "the intensity and persistence of [the claimant's] symptoms," as well as "the extent to which [those] symptoms limit [his or her] capacity for work." 20 C.F.R. §§ 404.1529(c), 416.929(c); see also SSR 16-3p, 2017 WL 5180304, at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

11

1. [ D]aily activities;

2. The location, duration, frequency, and intensity of []
pain or other symptoms;

3. Precipitating and aggravating factors;

4. The type, dosage, effectiveness, and side effects of
any medication [a claimant] take[s] or ha[s] taken to
alleviate [] pain or other symptoms;

5. Treatment, other than medication, [a claimant]
receive[s] or ha[s] received for relief of [] pain or
other symptoms;

6. Any measures [a claimant] use[s] or ha[s] used to
relieve [] pain or other symptoms (e.g., lying flat on
[his or her] back, standing for 15 to 20 minutes every
hour, or sleeping on a board, etc.); and

7. Any other factors concerning [a claimant's] functional
limitations and restrictions due to pain or other
symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (emphasis added); see also SSR 16-3p, 2017 WL 5180304, at *5.

In this case, the ALJ found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's

12

"statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 22.) Immediately following those findings, the ALJ provided this analysis:

> As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because he testified he had never missed a day of Abilify; however, in November 2021, he said he ran out of Abilify and Zoloft. He was sent a bridge prescription when he ran out of medications, but he did not pick them up. He stated he often yelled or got angry with people; however, he denied being irritable or having angry episodes since starting Abilify.

(Id. (internal parenthetical citation omitted).)

Plaintiff first challenges the ALJ's observation that Plaintiff's testimony that he had never missed a day of Abilify conflicted with his statement to his mental health provider in November 2021 that he had run out of Abilify and Zoloft (see id. (referencing Tr. 65, 468)). (See Docket Entry 10 at 4-6.) According to Plaintiff, "[he] messaged his provider on October 27, 2021, stating he ran out of med[ication]s and requesting a bridge prescription, but did not pick it up prior to the November 2, 2021, appointment" (id. at 5 (citing Tr. 468)) and, thus, Plaintiff argues that "[t]he ALJ is criticizing Plaintiff for requesting a medication refill on a Wednesday, and not picking it up by his appointment the following Tuesday" (id.). In Plaintiff's view, "[t]his is not a failure to treat, but a one-time lapse in

13

consistent treatment" (id.) and, in any event, "the ALJ was required to consider possible reasons for [Plaintiff's] failure to treat before finding Plaintiff's symptoms 'inconsistent with the evidence of record on that basis'" (id. (quoting Long v. Kijakazi, No. 7:21CV176, 2023 WL 2338027, at *6 (E.D.N.C. Jan. 10, 2023) (unpublished), recommendation adopted, 2023 WL 2333887 (E.D.N.C. Mar. 2, 2023) (unpublished))). Plaintiff additionally maintains that, "if the ALJ intended to portray Plaintiff as untruthful due to this mix-up, it would be somewhat absurd[,]" because "[t]he ALJ would be characterizing Plaintiff as deceitful for not remembering that he ran out of medications for less than one week in November of 2021, almost two years prior to the September 2023 hearing." (Id.) Plaintiff further asserts that "[a]sking Plaintiff if he has ever missed one day of medication is a setup for a 'gotcha' and not a legitimate reason to reject Plaintiff's symptoms." (Id. at 5-6.)

As an initial matter, in pointing out the inconsistency between Plaintiff's testimony and the record regarding lapses in Abilify, the ALJ made no finding that Plaintiff had failed to follow prescribed treatment under SSR 16-3p (see Tr. 22), and, thus, labored under no obligation "to consider possible reasons for [Plaintiff]'s failure to treat" (Docket Entry 10 at 5). See SSR 16-3p, 2017 WL 5180304, at *9 ("[The ALJ] will not find a[ claimant]'s symptoms inconsistent with the evidence in the record on th[e] basis [that the claimant failed to follow

14

prescribed treatment that might improve symptoms] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints").

Moreover, although the conflict between Plaintiff's testimony at the September 2023 hearing that he had never missed a day of Abilify (see Tr. 65) and record evidence that he had run out of Abilify (and Zoloft) in November 2021 (see Tr. 465) did not provide compelling evidence of an inconsistency in the evidence, as the Commissioner points out, the ALJ's observation nevertheless held some relevance to his assessment of the intensity of Plaintiff's mental symptoms:

> As the ALJ noted, . . . in November 2021, Plaintiff ran out of two of his medications, Abilify and Zoloft, for over a week, and he thereafter reported increased symptoms of anxiety, hopelessness, anhedonia, and isolation as a result (Tr. 22; Tr. 26[ ()]citing Tr. 468-87[)]). Th[e ALJ's] point was important because Plaintiff's compliance with medication significantly reduced his mental health symptoms; it was not merely a "setup for a 'gotcha'" as Plaintiff contends ([Docket Entry] 10 at 5). After restarting Abilify and Zoloft, Plaintiff reported in December 2021 that his mood was stable and he denied irritability or anger outbursts, his anxiety was well-managed, and his sleep had improved (Tr. 26[ () citing Tr. 499-509[)]). Plaintiff reported in March 2023 that "as long as I take my medicine, I'm good" (Tr. 31[ () citing Tr. 1389-1400[)]; see Tr. 1395).

(Docket Entry 12 at 8.)

Plaintiff next objects to the ALJ's remark "that '[Plaintiff] stated he often yelled or got angry with people; however, he denied being irritable or having angry episodes since starting Abilify."

15

(Docket Entry 10 at 6 (quoting Tr. 22 (in turn referencing Tr. 62-63, and citing Tr. 493)).)  According to Plaintiff, "[t]his is not entirely accurate, as Plaintiff did not testify to lashing out at people in his every day life, but while at work."  (Id.; see also id. (quoting Tr. 62-63 (reflecting Plaintiff's answer "[y]es, often" to counsel's question at hearing if, "at work, . . . [he] ever shout[ed] at people").)  Although Plaintiff acknowledges that, "[i]n the November 2021 treatment note - over a year after he stopped working - [he] reported feeling less irritable and denied having any anger issues since starting Abilify" (id. (citing Tr. 493)), Plaintiff points out that "he no longer had to deal with coworkers or even other people, generally, as he spen[t] most of his time alone" (id. (citing Tr. 67)).  Plaintiff additionally asserts that "[his] condition changing between 2021 and 2023 is not unusual, and is also not a reason to discount his subjective symptoms."  (Id. at 7; see also id. (citing SSR 16-3p, 2017 WL 5180304, at *9 (providing that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate," as "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time")).)

     Plaintiff's attempt to limit his alleged irritability and anger outbursts to the work setting falls short.  Indeed, the

16

testimony upon which Plaintiff relies presents a more nuanced picture of Plaintiff's problems with anger:

> [ATTORNEY:]    So, if I were to let's say, you know, get you a job bagging groceries at the local grocery store, what would be the issue with you doing that?  But you'd have to be there eight hours a day, five days a week[.]
>
> [PLAINTIFF:]    Picking up the bags now, my back is so out of shape.  <u>And it's hard for me to be around people.  I know when I go to the grocery store by myself, I have a hard time</u>.
>
> [ATTORNEY:]    Okay.  <u>Do you ever yell or get angry with people</u>?  Like when you were at work, did you get in shouting – did you ever shout at people?
>
> [PLAINTIFF:]    <u>Yes, often</u>.

(Tr. 62-63 (emphasis added).)  As the language emphasized above makes clear, Plaintiff testified that he had a hard time being around people in grocery stores, i.e., when not in a work setting. (<u>See</u> Tr. 62.)  Moreover, due to the compound nature of the last two of counsel's questions quoted above, the record remains ambiguous whether Plaintiff responded "[y]es, often" to "yell[ing] or get[ting] angry with people" in general or to "shout[ing] at people" at work, or both.  (Tr. 62-63.)  In any event, as the Commissioner points out, "Plaintiff's own reports to his medical providers and [] consultative [medical] examiner [Keisha Dixon, PA-C ('PA Dixon')] support the ALJ's understanding - this was not merely work-related irritability."  (Docket Entry 13 at 9 (citing

17

Tr. 413 ("[Plaintiff r]eports extensive history of disobedient behavior growing up, episodes of angry outbursts."), 693 ("[Plaintiff] states he is aggravated and frustrated easily, and has a bad temper.")); see also Tr. 417 (reporting, on February 17, 2021, three arguments since his last mental health visit one month earlier, and describing his "anger outbursts" as "improving"), 423 (documenting Plaintiff's report, on March 23, 2021, of one "anger outburst" at grocery store).) Thus, the ALJ properly found that Plaintiff's hearing testimony that he often "yell[ed] and g[o]t angry with people" (Tr. 62-63) conflicted with his November 2021 statement to a mental health provider "den[ying] feeling irritable or having anger episodes since restarting Abilify" (Tr. 493; see also Tr. 499 (same on Dec. 21, 2021), 510 (same on Jan. 18, 2022), 889 (same on May 10, 2022)). (See Tr. 22.)

Plaintiff additionally maintains that, "[o]ther than the[] two [inconsistencies discussed above], it does not appear that the ALJ evaluated Plaintiff's subjective complaints at any point," because "[t]he ALJ continue[d] on to provide a lengthy summary of the medical evidence in the file, without any criticisms of Plaintiff's testimony, activities of daily living, or other factors[,]" "described why [the ALJ] formulated Plaintiff's RFC in a certain way," "evaluate[d] the opinion evidence of record, and conclude[d] that Plaintiff was not disabled." (Docket Entry 10 at 7 (internal parenthetical citations omitted) (citing Tr. 22-40).) In

18

Plaintiff's view, "the recitation of medical evidence is no substitute for an evaluation of Plaintiff's subjective complaints." (Id. at 8 (citing Tyndall, 2023 WL 7149493, at *6).)

Plaintiff's argument glosses over the following analysis by the ALJ, which expressly compared Plaintiff's subjective statements with the evidence of record:

Regarding [Plaintiff]'s mental impairments, he has anxiety, PTSD, schizophrenia spectrum and other psychotic disorders, a personality disorder, and substance addition disorders (drugs and alcohol). He had one episode when his thoughts were non-linear and disorganized, and he had flight of ideas ([Tr. 415]). Once he was on medication, however, his thought processes were logical and linear, with intact associations. His insight was fair, and his judgment was appropriate. His memory was normal ([Tr. 425-26]), even though he reported short-term memory deficits ([Tr. 692-700]). He also reported concentration deficits and said he did not like tasks requiring sustained attention. He indicated he often did not finish tasks. He reported difficulty staying in his seat and stated he had restlessness and racing thoughts ([Tr. 407, 413, 692-700]). However, on mental status testing, his attention and concentration were normal ([Tr. 415, 425-26]). He indicated he had daily flashbacks but good energy ([Tr. 413, 423, 438]). The [ALJ] finds due to [Plaintiff]'s mental impairments, he can perform only simple, routine, repetitive tasks but not at a production rate pace (e.g., assembly line work).

[Plaintiff] said the medications keep his auditory hallucinations under control. He indicated the medication reduced the frequency and intensity of the hallucinations. He stated large crowds trigger hallucinations, and he had one every three to four weeks. He reported methadone was effective for his opioid addiction. He indicated his therapy is helpful, and he can perform his personal care (Hearing Testimony). In April 2020, he said he smoked crack cocaine and then snorted heroin, all while drinking beer. He was successfully given Narcan and tested positive for opiates and cocaine ([Tr. 648-53]). In December 2020, he was working with a peer support person and had recently

19

stopped using drugs.  He had anxiety, passive suicidal ideation, and a labile mood.  He had a history of childhood abuse and reported flashbacks and nightmares. His mood was depressed and anxious/fearful, and his affect was appropriate.  He reported auditory and visual hallucinations ([Tr. 407-12]).  In January 2021, he indicated he had anger outbursts and mood swings.  He reported anxiety over little things.  He was very tearful and had a labile affect.  His mood was irritable and anxious/fearful ([Tr. 413-16]).  In February 2021, he said he was doing better and had no side effects from the medication.  His anger and outbursts were better.  He reported four months of sobriety ([Tr. 417-22]).

In March 2021, he said he was doing well and had one anger outburst since the last visit ([Tr. 423-29]).  In April 2021, he stated everything was going well.  He had no anger outbursts, and his mood was more stable.  He denied panic attacks ([Tr. 430-37]).  In May 2021, his mood was stable, and his anxiety was manageable.  He had not had any panic attacks.  He reported one episode of using heroin, crack cocaine, and [f]entanyl.  He had a normal mental status exam, except his mood was anxious/fearful, and he reported auditory hallucinations ([Tr. 438-46]).  In July 2021, his anxiety was well-managed, and he denied panic attacks.  He reported he drank a 12-pack of beer daily but had cut back to every two or three days ([Tr. 447-56]).  In August 2021, his mood was stable, and his depression and anxiety were well-managed on Abilify, Zoloft, and Prazosin.  He had a normal mental status exam ([Tr. 457-67]).  In November 2021, he stated he had been out of his medications for a week and had increased anxiety ([Tr. 468-87]).  He was drinking less beer. He restarted Abilify ([Tr. 488-98]). In December 2021, his mood was stable, and []he was restarted on Zoloft.  His anxiety was well-managed ([Tr. 499-509]).  In May 2022, he said things were going well. He said he had quit drinking alcohol but would have two wine coolers if he was at a social function, which was not often.  He indicated Abilify was helpful for maintaining a stable mood and preventing psychotic symptoms ([Tr. 889-98]).  In August 2022, he said he was frustrated easily and had a bad temper.  He reported nightmares and anxiety over small tasks ([Tr. 692-700]). In October 2022, he had a stable mood and no hallucinations since July ([Tr. 909-18]).  In March 2023 he continued to have a stable mood and reported sobriety of two years.  He said he did not have hallucinations as

20

long as he took his medications, and he had no nightmares on Prazosin ([Tr. 1389-90, 1402, 1407]). In July 2023, his mood was ok, and he had no hallucinations or suicidal ideation ([Tr. 1414]). The [ALJ] finds that although [Plaintiff] has some symptoms of mood swings, anxiety, and hallucinations, and has engaged in alcohol and drug use, his mental health impairments are improved on psychotropic medications. Therefore, the [ALJ] finds [Plaintiff] can perform simple work-related decisions.

[Plaintiff] also has some social difficulties. He is paranoid and thinks people are talking about him or are out to get him, but Abilify helps. He reported difficulty being around people at the grocery store. He said large crowds trigger his hallucinations, and he tries to get away from the crowd at the bus stop. He stated he does not really socialize with his children much but can tolerate his grandchildren for a little while (Hearing Testimony). He has a history of antisocial behavior and past assaults. He indicated he hears voices telling him to harm people ([Tr. 407-12]). In February 2021, he stated he was doing better on medication and only had three arguments since the last visit but was able to walk away. He reported thought[s] of wanting to hurt others and was irritable but cooperative ([Tr. 417-29]). However, in July 2021, he was having a cookout for his wife on her birthday on the weekend ([Tr. 738-42]).[7] In November 2021, he was attempting to get out of his room and be more social. He denied feeling irritable or having anger episodes since restarting Abilify ([Tr. 488-98]). In December 2021, he denied irritability or anger outbursts ([Tr. 499-509]). In May 2022, he was continuing to work with the peer support person and reported going to social functions occasionally ([Tr. 889-98]). In July 2023, he said he was isolating more ([Tr. 1414]). The [ALJ] finds [Plaintiff] can be social on medication, but he more likely isolates. He has some paranoia and thoughts of hurting others, which he has not acted on. The [ALJ] finds due to his social difficulties, [Plaintiff] can

---

[7] Although the ALJ cited to Exhibit 6F, pages 38 through 42, as support for the statement that, "in July 2021, [Plaintiff] was having a cookout for his wife on her birthday on the weekend" (Tr. 36 (citing Tr. 738-42)), those pages do not contain any reference to a cookout and reflect a primary care treatment note from May 2021. The record does contain a mental health treatment note dated July 13, 2021, which reflects that "[Plaintiff] is having a cookout for wife's bday this weekend." (Tr. 447.)

21

> only have frequent interaction with supervisors and
> coworkers and occasional interaction with the public.

(Tr. 35-36 (emphasis added).)

As the language emphasized above makes clear, the ALJ considered Plaintiff's subjective statements to his mental health providers throughout the relevant time period in this case, including his report of "short-term memory deficits" (Tr. 35 (citing Tr. 692-700)) and "concentration deficits," "restlessness[,] and racing thoughts" (id. (citing Tr. 407, 413, 692-700)), but found them inconsistent with the record evidence (see id.), and provided explanations as to how the ALJ determined the limitations in the mental RFC (see Tr. 35-36). The ALJ's analysis, as emphasized above, also demonstrates that he expressly considered Plaintiff's "daily activities," the "duration, frequency, and intensity" of Plaintiff's reported mental symptoms, "[p]recipitating and aggravating factors," the "effectiveness[] and side effects of any medication [Plaintiff] t[ook] . . . to alleviate [his mental] symptoms," and "[t]reatment, other than medication," such as therapy, "[Plaintiff] receive[d] . . . for relief of [his mental] symptoms," 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8. The applicable regulations and SSR 16-3p required nothing more of the ALJ.

In light of the foregoing analysis, Plaintiff has not demonstrated that the ALJ erred in his evaluation of Plaintiff's

subjective symptom reporting and, thus, Plaintiff's first assignment of error fails as a matter of law.

## 2. Failure to Develop the Record

Next, Plaintiff contends that "[t]he ALJ erred by failing to develop the record as requested by Plaintiff's hearing representative." (Docket Entry 10 at 9 (bold font omitted).) In particular, Plaintiff asserts that "the ALJ erred by failing to . . . obtain[] a consultative examination related to Plaintiff's mental health conditions." (Id. at 10.) In that regard, Plaintiff notes that "[t]he record contains a few opinions which speak to his mental health, although none are useful" (id.), because the state agency psychological consultant at the initial level of review "opined that Plaintiff's mental health impairments were non-severe, which the ALJ properly found unpersuasive" (id. at 10-11 (internal parenthetical citation omitted) (citing Tr. 37, 91)), and the reconsideration-level state agency psychological consultant's "opinion is too vague to provide any meaningful insight, as the restrictions are entirely undefined" (id. at 11 (citing Tr. 111, 115-16)). Plaintiff further notes that the ALJ found PA Dixon's opinion that Plaintiff's "'mental health conditions [we]re not conducive for a work environment' . . . vague and not presented in vocationally relevant terms," as well as "on an issue reserved to the Commissioner." (Id. (quoting Tr. 695, and citing Tr. 37).) According to Plaintiff, "[his] representative has been requesting

23

development of the record since before the hearing" (id.), in that, "[a]t the hearing, [the] representative alluded to her pre-hearing brief, which . . . stated that a consultative mental examination may be necessary" (id. (referencing Tr. 52-53, and citing Tr. 390)), argued in her closing remarks at the hearing that "'maybe a further consultative examination needs to be done'" (id. (quoting Tr. 82)), and "challenged th[e ALJ's failure to order a consultative psychological examination] in her brief to the Appeals Council" (id. (citing Tr. 403)).  In Plaintiff's view, "[t]he inclusion of a [consultative psychological examination] report would [] likely change the outcome of the case" (id. at 13), because the VE testified that, "if Plaintiff was unable to consistently maintain his behavior, or was disrupting others on a regular basis, he would be unable to maintain gainful employment" (id. (citing Tr. 80-81)).  Those contentions miss the mark.

Although "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record," Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the ALJ "is not required to act as [a] claimant's counsel," and "is entitled to assume that a claimant represented by counsel is making h[is] strongest case for benefits," Jason L. v. O'Malley, No. 3:23CV307, 2024 WL 1152405, at *11 (S.D.W. Va. Feb. 29, 2024) (unpublished) (internal quotation marks omitted), recommendation adopted, 2024 WL 1149282 (S.D.W. Va. Mar. 15, 2024) (unpublished).

24

In order to fulfill the ALJ's duty to develop the record, the ALJ "may" order a consultative examination "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision on [the] claim," 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (emphasis added); see also Bishop v. Barnhart, 78 F. App'x 265, 268 (4th Cir. 2003) (noting that "regulations state that the ALJ has discretion in deciding whether to order a consultative examination" and "further provide that a consultative examination is required when the evidence as a whole is insufficient to support a decision" (internal citation omitted) (citing 20 C.F.R. §§ 404.1519a, 416.919a)).

To begin, Plaintiff's assertion that "[his] representative has been requesting development of the record since before the hearing" (Docket Entry 10 at 12 (emphasis added)) overstates his counsel's actions with regard to a potential consultative psychological examination. Although Plaintiff's counsel's pre-hearing brief observed that, "[g]iven [PA Dixon]'s assessment [that Plaintiff's mental health conditions were not conducive to a work environment], a consultative examination to further expand the scope of evidence of mental impairments may be necessary" (Tr. 390 (emphasis added)), counsel did not make a request of the ALJ to order a consultative psychological examination (see Tr. 389-91; see also Tr. 392 (counsel's pre-hearing "Five Day Letter" advising ALJ of

outstanding medical records but failing to request consultative psychological examination)).  Moreover, at the hearing, counsel referenced her earlier statement in the pre-hearing "brief that maybe a further consultative examination needs to be done" (Tr. 82 (emphasis added)), but again failed to request the ALJ to order a consultative psychological examination (see Tr. 82-84).  Indeed, counsel indicated at the outset of the hearing that she had no "objections to the exhibits in the file" (Tr. 51), and deemed the record "complete" (Tr. 52 (emphasis added)).  "[Plaintiff], through counsel, [may not] rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation."  Perry v. Astrue, No. 3:10CV1248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011) (unpublished) (quoting Maes v. Astrue, 522 F.3d 1093, 1097 (10th Cir. 2008)); see also Savage v. Saul, No. 3:20CV482, 2021 WL 2168909, at *8 (S.D.W. Va. May 7, 2021) (unpublished) (rejecting the plaintiff's argument that "ALJ erred in her duty to develop the administrative record" where, "during the hearing, the ALJ asked [the plaintiff]'s counsel if he had reviewed the electronic record[] and . . . if it was up to date, and he responded, 'To the best of our ability, Your Honor[]' . . . [and] did not assert that anything was missing from the administrative record" (some internal quotation marks omitted)), recommendation adopted, 2021 WL 2169514 (S.D.W. Va. May 27, 2021) (unpublished).

26

Beyond counsel's failure to request a consultative psychological examination, the record undermines Plaintiff's assertion that "none" of the "opinions which speak to his mental health . . . [was] useful." (Docket Entry 10 at 10.) Although the ALJ rejected the initial-level state agency psychological consultant's opinion that Plaintiff's mental impairments qualified as non-severe (<u>see</u> Tr. 37; <u>see also</u> Tr. 90-91, 98-99), the ALJ found "persuasive" the reconsideration-level state agency psychological consultant's opinions (Tr. 37), which included a finding that Plaintiff's mental impairments qualified as "severe" (Tr. 110-11, 123-24), as well as opinions that:

- "it is plausible to assume that any high-stress or complex work or work involving conflict such as a collections call center could exacerbate [Plaintiff's mental health symptoms], including stress possibly leading to resumption of substance abuse" (Tr. 111, 124);

- "[Plaintiff] will have difficulty with retaining and executing some complex work tasks" (Tr. 115, 128); and

- "[i]t is [] in the interest of [Plaintiff] to limit [him] to [simple, routine, and repetitive tasks ('SRRTs')] in a low-stress, stable setting with minimal interaction" (Tr. 111, 124).

Contrary to Plaintiff's assertions, those opinions provide "vocationally relevant guidance" and qualify neither as "undefined" nor "vague" (Docket Entry 10 at 11). <u>See</u> <u>Marvin F. v. Kijakazi</u>, No. 9:22CV3019, 2023 WL 5056950, at *12 (D.S.C. June 12, 2023) (unpublished) (holding that ALJ did not fail to develop record by

27

not ordering consultative psychological examination where "the record had sufficient medical evidence for the ALJ to make an informed decision[,]" including "the prior administrative medical findings of state agency psychological experts[,]" who "are highly qualified and experts in Social Security disability evaluation" (internal quotation marks omitted)), recommendation adopted, 2023 WL 5041324 (D.S.C. Aug. 7, 2023) (unpublished).

Moreover, consistent with the ALJ's decision to find the reconsideration-level consultant's opinions "persuasive" (Tr. 37), the ALJ's RFC includes limitations to SRRTs, no work involving a production rate pace or an assembly line, simple work-related decisions, frequent interaction with supervisors and co-workers, and occasional interaction with the public (see Tr. 20). Beyond that consultant's specific mental limitations, which the ALJ incorporated into the RFC, the record also contains extensive records of Plaintiff's mental health treatment during the relevant period in this case (see Tr. 407-525, 841-918, 1366-1425), and Plaintiff (through counsel) denied that the record lacked any of his treatment records (see Tr. 51-52).

Under such circumstances, the ALJ had before him an adequate record of Plaintiff's mental impairments, and Plaintiff has not shown that the ALJ failed to fulfill his duty to develop the record by not ordering a consultative psychological examination. See McInerney v. Commissioner of Soc. Sec., No. 2:15CV339, 2016 WL

28

4651372, at *5 (M.D. Fla. Sept. 7, 2016) (unpublished) ("[T]he lack of a psychological consultative examination does not render the record incomplete or inadequate. The ALJ's opinion thoroughly evaluated [the p]laintiff's medical evidence related to his mental health treatment, including evidence that was not available to the [reconsideration-level state agency] psychological consultant . . . . The record was sufficient for the ALJ to evaluate [the p]laintiff's mental impairments, and does not show any gaps in evidence necessary to demonstrate prejudice.").

Put simply, Plaintiff's second issue on review lacks merit.

### 3. Age as a Vocational Factor

In Plaintiff's third and final issue on review, he maintains that "[t]he ALJ's failure to ask the VE to consider as a vocational factor the hypothetical claimant's classification as one closely approaching advanced age is error that invalidates the VE's testimony at [s]tep 5 [of the SEP]." (Docket Entry 10 at 13 (bold font and block formatting omitted); see also Docket Entry 14 at 3-4.) In that regard, Plaintiff notes that "[t]he ALJ's reliance on VE testimony was premised on whether 'jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and [RFC]'" (Docket Entry 10 at 14 (quoting Tr. 39-40)), and thus argues that "the VE must be familiar with the Plaintiff's age, education, work experience, and RFC as a prerequisite to providing [s]tep [f]ive testimony" (id.), but that

29

"Plaintiff's age [wa]s never mentioned in the transcript of Plaintiff's September 2023 hearing" (id. (citing Tr. 47-83)). Plaintiff additionally asserts that, "[g]iven that [he] was a younger individual age 49 as of his onset date, one cannot assume that the VE knew he [sic] was being asked to consider an individual closely approaching advanced age (age 50-54) as opposed to a younger individual." (Id.)

Plaintiff further maintains that the SSA's Vocational Expert Handbook "only advises that VEs prepare for the hearing by familiarizing themselves with a claimant's previous work" and emphasizes the importance of "both the alleged onset date and the date of the ALJ's decision . . . which, for a layperson not familiar with the law such as a VE, could be confusing as to whether to use the claimant's age at his alleged onset date, or age at the time of the hearing/date of decision." (Id. at 16 (citing Vocational Expert Handbook, available at https://www.ssa. gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf).) According to Plaintiff, a case from the District of South Carolina supports his position (see id. (citing Jolly v. Barnhart, 465 F. Supp. 2d 498, 504-05 (D.S.C. 2006))), in that "[t]he [c]ourt found that, because the VE did not explicitly consider a significant vocational factor in reaching his opinion, [the court] was unable to find that the VE's opinion constitute[d] substantial evidence in support of the ALJ's determination[,]" and

30

"[t]he matter was remanded to the ALJ for reconsideration in light of Plaintiff's correct age" (id. at 17 (citing Jolly, 465 F. Supp. 2d at 505); see also id. (citing Roberts v. Astrue, No. 5:12CV1308, 2013 WL 823289, at *4-5 (N.D. Ohio Mar. 6, 2013) (unpublished)).)

As a threshold matter, despite Plaintiff's assertion in this Court that the record remained ambiguous as to whether "the VE knew he [sic] was being asked to consider an individual closely approaching advanced age (age 50-54) as opposed to a younger individual" in the hypothetical questions posed by the ALJ (Docket Entry 10 at 14), at the hearing before the ALJ, Plaintiff failed to question the VE regarding Plaintiff's age classification, or how that classification would impact Plaintiff's ability to perform the jobs the VE cited, notwithstanding the fact that Plaintiff took the opportunity (through his attorney) to cross-examine the VE. (See Tr. 80-82.) As a result, Plaintiff has forfeited, in this Court, any challenge to the ALJ's failure to specifically include an individual "closely approaching advanced age" in the hypothetical questions to the VE. See Coyier v. Saul, Civ. No. 20-1899, 2021 WL 2173425, at *2 (7th Cir. May 27, 2021) (unpublished) (holding that the plaintiff "waived any challenge to the VE's testimony by failing to ask any questions to reveal shortcomings in the job-number estimates"); Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017) ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at their

31

administrative hearings in order to preserve them on appeal."); Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (holding the claimant's failure to raise issue before ALJ "waived [the claim] from being raised on appeal"); Bunton v. Colvin, No. 1:10CV786, 2014 WL 639618, at *5 (M.D.N.C. Feb. 18, 2014) (unpublished) (finding waiver of issue on judicial review where the plaintiff "failed to mount any opposition . . . to the view that he retained the capacity to do the [jobs proffered by the VE], despite . . . the opportunity . . . to question the VE about . . . those positions"), recommendation adopted, slip op. (M.D.N.C. Mar. 10, 2014) (Schroeder, J); Stepinski v. Astrue, No. CA 11–183, 2012 WL 3866678, at *9–10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances.  This [c]ourt is disinclined to provide such an incentive[ ] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), recommendation adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished); Young v. United States Comm'r of Soc. Sec., No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009) (unpublished) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts . . ., and then present that conflict as reversible error, when the conflict

32

was not deemed sufficient to merit adversarial development in the administrative hearing.").

Even if Plaintiff had not forfeited his right to raise this issue on judicial review, it still fails on its merits.  At the outset of the hearing, the ALJ asked Plaintiff his date of birth, and he responded by stating his birthdate on the record.  (See Tr. 49.)  Thus, when the ALJ asked the VE if jobs existed for "an individual of [Plaintiff]'s age, education [and] past job" (Tr. 77 (emphasis added)), the VE, knowing Plaintiff's birthdate, could perform the simple calculations involved in determining Plaintiff's age on his alleged onset date (49 - a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c)) and at the time of the hearing (52 - a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d)).

That fact also distinguishes the instant case from the facts in Jolly.  In that case, the ALJ's decision incorrectly stated Plaintiff's age as 9 years younger than her actual age, improperly identified her as a "younger person" rather than a "person closely approaching advanced age" (and nearly a person of "advanced age") and used the wrong Medical-Vocational Rule as a framework for decision.  Jolly, 465 F. Supp. 2d at 502-04.  Moreover, at the hearing, "the ALJ did not ask the VE to assume the claimant was any particular age at all."  Id. at 505 (emphasis added).  Thus, "the court f[ound] that failing to consider a claimant's age as a

33

vocational factor when the claimant is 'closely approaching advanced age' [wa]s error" and "remanded to the ALJ for reconsideration in light of [the p]laintiff's correct age." Id. Other cases remanding based on Jolly also involved ALJs who failed to include the claimant's specific age and/or age classification in the hypothetical question to the VE and did not provide the claimant's birthdate to the VE. See Jennifer S. v. Bisignano, No. 5:24CV71, 2025 WL 2388607, at *9 (W.D. Va. Aug. 15, 2025) (unpublished) ("[The] ALJ [] did not ask [the VE] to assume a hypothetical person who is closely approaching advanced age. In fact, the ALJ did not ask the VE to assume [the plaintiff] was any particular age at all. He asked the VE only to assume someone who is the same age as [the plaintiff}. These errors might have been harmless if the record clearly demonstrated [the VE] knew [ the plaintiff's birthdate] . . . ." (emphasis added) (internal quotation marks and citations omitted)); Roberts v. Astrue, No. 5:12CV1308, 2013 WL 823289, at *5 (N.D. Ohio Mar. 6, 2013) (unpublished) ("The ALJ did ask the VE to consider a hypothetical individual of the same age [as the plaintiff], yet the [c]ourt cannot tell from the record that the VE recognized [the plaintiff's] recent birthday." (emphasis added) (internal quotation marks omitted)).

This case, by contrast, harmonizes more with Strickland v. Berryhill, No. 7:16CV252, 2017 WL 3910436, at *11 (E.D.N.C. Aug.

21, 2017) (unpublished).  In that case, the court found harmless error where the ALJ failed to include age in the hypothetical question to the VE, but the VE remained present throughout the hearing and "the ALJ asked [the plaintiff] her date of birth, reflective of her age, at the outset" of the hearing.  Strickland, 2017 WL 3910436, at *11.  The court further noted that the plaintiff "failed to allege any harm resulting from [the] ALJ's failure to state [the plaintiff]'s age to the VE[,]" in that "[the plaintiff] d[id] not contend that her age would preclude her from performing any of the jobs identified at step five or that she would have been entitled to a directed finding of disability under the Medical-Vocational Guidelines."  Id.  Similarly, here, Plaintiff does not allege any particular harm arising from the ALJ's failure to specifically include a "person closely approaching advanced age" as a vocational factor in the hypothetical question, beyond making the generalized observation that, "[f]or a person closely approaching advanced age, the regulations direct the Commissioner to consider whether age, along with severe impairments and limited work experience, may seriously affect the ability to adjust to other work" (id. at 14 (citing 20 C.F.R. §§ 404.1563(d), 416.963(d)); see also Docket Entry 14 at 3-4).

Accordingly, Plaintiff's third and final assignment of error falls short.

35

## III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** and that this action is **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 6, 2026